## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### CIVIL CASE NO. 3:08cv349

| | | |
|---|---|---|
| GARDEN & GUN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **O R D E R** |
| | ) | |
| TWODALGALS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Temporary Restraining Order [Doc. 4], filed July 30, 2008, which has previously been converted to a motion for a preliminary injunction on July 31, 2008.  For the reasons stated below, the motion is granted in part and denied in part.

### PROCEDURAL HISTORY

On July 28, 2008, the Plaintiff Garden & Gun, LLC (Garden & Gun) filed a Complaint in the General Court of Justice, Superior Court Division, Mecklenburg County, North Carolina.  The Plaintiff also simultaneously moved for a temporary restraining order to prevent the opening of a night club in Charlotte by the Defendant to be called "The Garden and Gun

1

Club."  The Complaint states claims for (1) a violation of the Lanham Act, 15 U.S.C. §1125(a), for false designation of origin; (2) common law trademark infringement; (3)  violations of the Unfair and Deceptive Trade Practices Act, N.C.G.S. §§75-1.1, *et. seq.*; and (4) permanent injunctive relief.  The Defendant TwoDalGals, LLC (Club) removed the action to this Court on July 29, 2008.  [Doc. 1].

Once removed to this Court, the Plaintiff filed the pending motion for a temporary restraining order.  [Doc. 4].  On July 31, 2008, Hon. Graham C. Mullen ruled during a hearing that the motion for a temporary restraining order was in actuality a motion for a preliminary injunction.[1] [Doc. 7, filed July 31, 2008].  As a result, Judge Mullen scheduled the matter for a hearing before the undersigned as the judicial officer assigned to the case. [Id.].  The hearing was held on August 15, 2008 and the matter is ready for disposition.

## FACTUAL BACKGROUND

The following facts are either undisputed by the parties or based on the evidence presented at the preliminary injunction hearing.

At issue in this case is the use of the name "Garden & Gun."  That

---

[1] Judge Mullen presided over the hearing due to the absence of the undersigned from the District.

name finds its genesis separate from either of the parties to this suit.  In the late 1970's and early 1980's, the Garden and Gun Club was a popular nightclub in Charleston, South Carolina.[2] [Doc. 1-2 at Exhibit A; Doc. 9-2, filed August 12, 2008, at Exhibit 1].

> The Garden & Gun Club was a gay bar where everybody ... movers, shakers, partyers, hipsters, social mavens ... drank and danced from the late 1970s to the mid-1980s.  The Garden & Gun Club   ...  was famous throughout South Carolina, although few people outside Charleston still remember it.

[Id.].

There is no indication in the record that the owners of the original Garden & Gun Club in Charleston ever obtained a trademark for the name.  It ceased business some twenty years ago.

Evening Post Publishing Company (Evening Post) obtained the trademark "Garden & Gun."  [Doc. 1-2, filed July 29, 2008, at ¶5].   Evening Post is also the parent company of Plaintiff Garden & Gun, LLC, a South Carolina limited liability company, which publishes a magazine named "Garden & Gun."  [Id.].  Evening Post assigned the trademark "Garden & Gun" to the Plaintiff which uses the mark in connection with the publication of the magazine. [Id.].  The trademark has been registered in the State of

---

[2] Where no citation to a pleading is made, the facts were presented during the hearing.

South Carolina.  [Id.].  The South Carolina mark has also been registered in North Carolina. [Doc. 5-2, filed July 30, 2008]. That registration states that the mark was first used in September 2006.  The mark is not federally registered.[3]

Rebecca Darwin (Darwin) is the president of Garden & Gun, LLC and the publisher of the magazine.  The name for the magazine was suggested to her by John Wilson who was the founding editor of the magazine. Darwin, who knew nothing about the old Garden & Gun Club in Charleston, thought the name evoked images of the land; *i.e.,* garden, as well as of the sporting life; *i.e.*, gun.  It reminded her of "Town and Country."  Darwin testified that the magazine is not about gardening.  Instead, the name of the magazine is meant to evoke an image of the modern South.  At the time that she chose the name for the magazine, she remained unaware of the former Charleston nightclub.

Beginning in April 2007, Garden & Gun magazine has been published as a periodic magazine dedicated to "sporting culture, food, literature, art, music, entertainment and the home in the modern South."

---

[3] The lack of federal registration is not an impediment to the relief Plaintiff seeks. "Section 43(a) of the Lanham Act, prohibiting the use of false designations of origin, protects against [trade] mark infringement even if the mark has not been federally registered."  U.S. Search, LLC v. U. S. Search.com Inc., 300 F.3d 517, 522 (4th Cir. 2002), *citing* 15 U.S.C. §1125(a).

[Doc. 1-2 at ¶7]. It has over 51,000 subscribers with 5,200 of them residing in North Carolina. [Id., at ¶8]. Total distribution of each issue is over 150,000, and the magazine has a total readership of some 450,000. The magazine has been well-received and has won various awards in the publishing industry. [Id., at ¶¶10, 11]. The Plaintiff has invested over $5 million in development, publication and advertising of the magazine.[4] [Id., at ¶9]. The Plaintiff has never granted any other entity or individual the right to use its name and trademark.

The Defendant, a North Carolina limited liability company, intends to open a nightclub in Charlotte on or about September 1, 2008 called "The Garden and Gun Club."[5] [Id., at ¶¶2, 14]. The Club will be a private, members-only night club; thus, members of the general public will not be able to gain admission. [Doc. 6-3, filed July 30, 2008, at ¶2]. Membership at this point, however, is "complimentary" and the Club has 1,000 members. [Id., at ¶6]. In preparation for opening the Club, its owners have spent approximately $15,000 "for signage, membership applications, tee

---

[4] Darwin testified at the hearing that seven and a half million dollars has been invested in the magazine.

[5] The website for the Club, states that it will open on Friday, September 5, 2008. www.thegardenandgunclub.com. It also states that "complimentary memberships are available prior to opening." [Id.]; see also, [Doc. 1-2 at Exhibits H, I & K].

shirts, paper products, membership cards, business cards, local advertising and promotional activities[.]" [Id., at ¶3]. Although there is no specific evidence before the Court regarding the amount of funds expended on a website for the Club, the business card of Defendant's creative director, Andrew Kastanas, discloses the existence of such a site and exhibits attached to the pleadings refer to the site. [Id., at ¶9]. The Club asserts that if it is not able to use this name, it will lose its $15,000 investment, would have to make an additional such investment under a new name, and would be delayed in opening, causing lost business revenue. [Id., at ¶¶4,5].

The Club's creative director, Kastanas, admits that he intentionally selected the name of the Charleston nightclub for this new club. [Id., at ¶7]. At the time he selected the name, he was unaware that there was a magazine with a similar name. [Id., at ¶8].

The Plaintiff alleges that the Defendant's logo is confusingly similar to its own and that the addition of the word "Club" will not prevent confusion as to whether the magazine owns, sponsors, endorses or otherwise supports the nightclub. [Doc. 1-2]. Plaintiff has presented copies of the signs which appear at each party's business location. [Id., at Exhibits J & K]. The Plaintiff's sign contains a fleur-de-lis with Baroque scrolls framing

a jumping fox and crossed rifles underneath. [Id., at Exhibit J].  The logo "Garden & Gun" appears at the bottom of the sign. [Id.].  The logo "Garden & Gun" also appears on the company's website and the magazine absent the fleur-de-lis, scrolls, fox and rifles. [Id., at Exhibit A].  The Club's sign and logo has calla lilies framing a coat of arms containing its logo "The Garden and Gun Club" with crossed dueling pistols underneath. [Id., at Exhibit K].

Darwin testified that the mark was registered in North Carolina about five or six weeks after she learned that the Club intended to open using the trademark name.  The registration was in direct response to learning about the Defendant's plans to open the nightclub.  At the time of the hearing, the Plaintiff had not suffered any advertising loss attributable to the plans to open the Club because the advertisers do not yet know about the Club.  No harm had occurred at the time of the hearing because the Club had not yet opened.

Counsel for the Club argued at the hearing that granting a preliminary injunction prohibiting the use of the name would be a death knell to the Club.  Due to a lack of funds for further investment in a new name, logo, *etc.*, the Club would simply go out of business before it opened.

## STANDARD OF REVIEW

In [the Fourth Circuit], the entry of a preliminary injunction is governed by the four-part test set forth in <u>Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.</u>, 550 F.2d 189 (4th Cir. 1977), which requires a court to consider "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the injunction is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest."

When deciding whether to grant a preliminary injunction, the court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant. If the balance of hardships "tips decidedly in favor of the plaintiff," then typically it will "be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." But if the balance of hardships is substantially equal as between the plaintiff and defendant, then "the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success.

...

In Lanham Act cases involving trademark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion, the key element in an infringement case.

<u>Scotts Co. v. United Industries Corp</u>., 315 F.3d 264, 271, 273 (4th Cir. 2002) (other citations omitted).

In this case, the Plaintiff claims it will be irreparably harmed because of the likelihood of confusion between its mark and the Club's logo. As a

result, before the <u>Blackwelder</u> test may be applied, the Court must inquire as to the substance of the Plaintiff's Lanham Act claim.[6] <u>Id.</u>; <u>Wonder Works v. Cranium, Inc.</u>, 455 F.Supp.2d 453, 457 (D.S.C. 2006).

## DISCUSSION

> In order to prevail in an action for [trade] mark infringement ... under [15 U.S.C. §1125(a)] of the Lanham Act, a plaintiff must "first and most fundamentally prove that it has a valid and protectable mark." If the plaintiff's mark is deemed to be protectable, it still cannot prevail unless it can show that the defendant's use of an identical or similar mark is likely to cause confusion among consumers.
>
> ...
>
> To ascertain whether a mark is protected, [the Court] must determine whether it is (1) generic, (2) descriptive; (3) suggestive or (4) arbitrary or fanciful. "The protection accorded trademarks is directly related to the mark's distinctiveness." If a term is generic (the common name for a product or service), it is ineligible for protection.[7] The public has an inherent right to call a product or service by its generic name. Fanciful (made-up words expressly coined to serve as trade or service marks), arbitrary (common words applied in unfamiliar ways), and suggestive marks (words that connote, rather than describe, some quality or characteristic of a product or service) are inherently distinctive, and thus receive the greatest protection against infringement. A descriptive mark may be eligible for protection, but only if it has

---

[6] The Plaintiff's request for injunctive relief is limited to the Lanham Act claim.

[7] The parties do not argue that the mark is generic. See, *e.g.*, <u>Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1141 (9th Cir. 2002) ("Entrepreneur does not state the general name of EMI's product–a magazine–and therefore does not fit within the generic category.").

acquired a "secondary meaning" in the minds of the public.

" U.S. Search, LLC v. U. S. Search.com Inc., 300 F.3d 517, 523 (4th Cir. 2002) (citations omitted).

During the hearing, the Plaintiff argued that the mark is suggestive or "possibly" arbitrary. In any event, it argued the mark is not descriptive. In its brief in support of the motion, however, Plaintiff argued that the mark is descriptive and has secondary meaning. [Doc. 5, filed July 30, 2008, at 6]. The Defendant conceded that the mark might be suggestive but argued that it could also be found descriptive. The Defendant did not dispute the Plaintiff's contention that the mark has secondary meaning.[8] The Defendant argued that whether the mark is suggestive or descriptive is a jury question and the Plaintiff did not disagree. Thus, for purposes of this motion, the parties have conceded that the trademark is entitled to protection as either a suggestive mark or a descriptive mark having secondary meaning.[9]

---

[8] The Defendant did argue that the mark is not inherently distinctive. "The general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992).

[9] A mark has acquired secondary meaning only if it has become distinctive of the Plaintiff's goods in commerce; that is, where there is consumer acceptance and recognition of such mark as denoting only one seller or source. 2 McCarthy on Trademarks and Unfair Competition, §11:25 (2008).

Having determined that the Plaintiff's mark is entitled to protection, the Court addresses the issue of whether the Plaintiff has shown a likelihood of confusion.  The Fourth Circuit has identified seven factors to consider in determining whether the mark holder has shown the likelihood of confusion:

> (1) the strength or distinctiveness of the [Plaintiff's] mark;
> (2) the similarity of the two marks;
> (3) the similarity of the goods and services that the marks identify;
> (4) the similarity of the facilities that the two parties use in their businesses;
> (5) the similarity of the advertising the two parties use;
> (6) the defendant's intent; and
> (7) actual confusion.

Synergistic Intern., LLC v. Korman, 470 F.3d 162, 171 (4th Cir. 2006).

As to the first factor, the strongest marks which receive the most protection are arbitrary or fanciful.  Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2002).  The weakest marks are generic and receive no trademark protection.  Id.  In between lie the descriptive and suggestive marks with the latter having the greater strength.  Id.; *accord*, Synergistic, 470 F.3d at 171-72.  For purposes of this motion, the parties have conceded that the mark is either descriptive with secondary meaning or suggestive and thus entitled to protection.  The Plaintiff has shown the mark's presence within the magazine industry by the number of present

and prospective customers which understand the designation to refer to this particular magazine.  Id., at 173.  Indeed, the uniqueness of the name itself has been shown to capture the attention of magazine readers, as shown by exhibits attached to the Complaint.  Id.; [Doc. 1-2]; Wonder Works, 455 F.Supp.2d at 458 (conceptual strength of the mark should be considered).  The magazine has shown that it has done extensive advertising and marketing and has expended more than five million dollars placing its mark into the publishing industry and the minds of the consumers.  Petro Stopping Centers, L.P. v. James River Petroleum, 130 F.3d 88, 93 (4th Cir. 1997), certiorari denied 523 U.S. 1095, 118 S.Ct. 1561, 140 L.Ed.2d 793 (1998) ("The strength of a mark 'ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source.'") (citations omitted); Synergistic, 470 F.3d 162.  The Court therefore finds the mark within the magazine industry to be commercially strong.

The next factor considers the similarity of the two marks.  Obviously, the greater the similarity between the two marks, the greater the likelihood of confusion.  Id.  The Defendant concedes this point.  "In this case, the marks at issue appear and sound similar.  This is not surprising, since they are both directly derived from the long-abandoned name of the same

nightclub." [Doc. 9 at 5].

As to the issue of the similarity of the goods identified, the Defendant argues that the products are so dissimilar that no confusion can result. The Plaintiff argues that confusion will arise as to source; that is, that the general public will assume a connection between the magazine and the nightclub or presume that the magazine sponsors the nightclub. "The confusion that is remedied by trademark and unfair competition law is confusion not only as to source, but also as to affiliation, connection or sponsorship." 4 McCarthy, Trademarks and Unfair Competition at §23:8. So, for example, in Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658 (5th Cir. 2000), Ralph Lauren, the fashion designer, sued a magazine publisher alleging the magazine title "POLO" infringed his "Polo" mark. "Direct competition between the parties' product is not required in order to find a likelihood of confusion." Id., at 666. "[W]hen the sponsor or maker of one business or product might naturally be assumed to be the maker or sponsor of another business product ... the deceived customer buys the infringer's product in the belief that it originates with the trademark owner or that it is in some affiliated with the owner." Elvis Presley Enterprises, Inc. v. Capece, 141 F.3d 188, 202 (5th Cir. 1998), *quoting* World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 488

13

(5th Cir. 1971). "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection." Westchester, 214 F.3d at 666. For the purposes of this motion, the Court finds that consumers could assume that a nightclub bearing the name "The Garden and Gun Club" is sponsored by, affiliated with or otherwise supported by a magazine named "Garden & Gun." Id.; *accord*, Turner v. HMH Pub. Co., 380 F.2d 224 (5th Cir. 1967), *certiorari denied* 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967) (Defendant owner of nightclub called "Playboy" could not avoid confusion with Playboy magazine where the parent company of magazine also owned "Playboy Clubs" nightclubs; thus, consumers would assume a sponsorship); Johnson Pub. Co. v. Willitts Designs Intern., 1998 WL 341618 (N.D.Ill. 1998) (consumers may believe that figurines are endorsed by Ebony magazine therefore defendant may not use mark Ebony Visions).

Considering the fourth and fifth factors, while the facilities used by the parties are different, it appears that they do use similar advertising techniques in the form of websites, chatrooms and blogs. The Court finds that these similar advertising and marketing techniques would contribute to a belief that the two dissimilar products are affiliated. See, *e.g.*, Carefirst of Maryland, Inc. v. First Care, P.C., 434 F.3d 263, 273 (4th Cir. 1006) (in

14

comparing advertising, look at the media used, geographic area covered, appearance and content of the advertising). Such confusion is all the more likely in this day of the use of internet search engines by the general consuming public.

Actual intent to confuse is not necessary to state a claim under the Lanham Act. 4 McCarthy at §23:107. Proof of intent, however. is relevant to injunctive relief. Id., at §23:108. The Defendant has claimed that when it selected its name, it was unaware of the existence of the magazine. Plaintiff's witness, Darwin, testified that she was unaware of the existence of either nightclub when she selected the magazine's name. Thus, this factor does not weigh in favor of either party.

Nor have the parties at this point shown any evidence of actual confusion. Actual confusion, however, is not required in order to state a claim under the Lanham Act. 4 McCarthy, supra., at §23:12.

Having weighed the factors at issue, the Court finds that the Plaintiff has established by a preponderance of the evidence a likelihood of confusion. KP Permanent Make-Up, Inc. v. Lasting Impression I , 408 F.3d 596 (9th Cir. 2005); Worsham Sprinkler Co., Inc. v. Wes Worsham Fire Protection, LLC, 419 F.Supp.2d 861 (E.D.Va. 2006). Because the Plaintiff has shown a likelihood of confusion, a presumption of irreparable harm to

the Plaintiff arises.[10]  Scotts Co., 315 F.3d at 273.

The Court therefore considers the likelihood of harm to the Defendant if the injunction is granted.  The Defendant has asserted that it will not have the financial resources to go forward as a business if the injunction is granted.  Wilson-Cook Medical, Inc. v. Wiltek Medical, Inc., 927 F.2d 598 (4th Cir. 1991) (issuing an injunction would have a "death penalty effect" on the defendant's business); Northgate Associates, LLLP v. NY Credit Funding I, LLC, 2008 WL 3200630 **6 (M.D.N.C. 2008) (injuries such as loss of the right to continue a business, loss of permanent relationships with customers and loss of goodwill equals harm).  The Court is therefore required to balance the harm to the Plaintiff if the injunction is denied against the harm to the Defendant if the injunction is granted.

The Plaintiff has shown the investment of more than five million dollars over the past two years in its mark versus a $15,000 investment in a nightclub which has not yet opened.  Northgate Associates, LLLP, 2008 WL 3200630; Ferrellgas Partners, L.P. v. Barrow, 143 Fed.Appx. 180, 191 (11th Cir. 2005).  The Plaintiff has also shown that consumers identify its

---

[10] The Defendant has argued that the Plaintiff delayed in bringing this action and that such delay shows there is no real irreparable harm of concern to the Plaintiff. Thus, it argues the Plaintiff has no likelihood of success. The Court rejects this argument for the reasons stated infra.

mark with its product whereas the Defendant has limited goodwill in its name.  Id.; Northgate Associates, LLLP, 2008 WL 3200630.  As noted, the Plaintiff has established the likelihood of confusion if the Defendant uses the mark in connection with its product.  Scotts, 315 F.3d at 286 (citing importance of evidence related to consumer confusion in assessing whether injunction should issue).  In addition, the parties have agreed that the case is suitable for disposition on a fast track and without summary judgment motions.  Ferrellgas, 143 Fed.Appx. 180.  Any injunctive relief will, therefore, be limited to a relatively brief period of time.  Id.

   In this case, by virtue of the narrowly fashioned preliminary injunction set forth below, the Defendant will suffer minimal harm.  Scotts, 315 F.3d at 285.  Defendant conceded as much in the preliminary injunction hearing.  The bond which the Court will require the Plaintiff to post will cover any additional costs incurred by the Defendant in complying with the narrow injunction, should the Defendant ultimately prevail.  Id., citing Hoechst Diafoil Co. V. Nan Ya Plastics Corp., 174 F.3d 411, 421 n.3 (4th Cir. 1999).

   As a result, the Court finds that the balance tips decidedly in favor of the Plaintiff which has raised serious and substantial questions going to the merits of the action.  Scotts, 315 F.3d at 271.  The questions raised

warrant deliberate investigation and in the interim period, the Court finds that a narrowly tailored injunction will, as nearly as possible, preserve the status quo for both parties.  Id., at 271-72.

In order to do the least harm to both parties, the Court will therefore devise injunctive relief combined with placing the case on a fast track for resolution.  See, *e.g.*, Scotts, 315 F.3d at 284 ("The entire preliminary injunction inquiry, ... is intended to ensure that the district court "choose[s] the course of action that will minimize the costs of being mistaken.") (citations omitted);  Moller-Maersk A/S v. Escrub Systems, Inc., 2007 WL 4562827 (E.D.Va. 2007) (limiting time period of injunctive relief).  This will also insure that the public interest is served.  Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001) (the public interest is served by an injunction which avoids confusion in the marketplace).  Requiring the Defendant to use disclaimers of any relationship, sponsorship or affiliation with the Plaintiff will prevent consumer confusion in the interim.  5 McCarthy at §30.3 (tailoring injunction by disclaimer of association will preclude confusion).

Finally, at the hearing the parties agreed this case should be placed on a fast track for trial.  As a result, the case shall be calendared for trial during the February 2009 term of court.  The parties also agreed the case

is not suitable for disposition on a motion for summary judgment and thus no deadline for such a motion shall be provided.  The parties shall advise the Court of any other deadlines which they deem necessary by means of a Certificate of Initial Attorneys' Conference.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Temporary Restraining Order [Doc. 4], filed July 30, 2008 and converted to a motion for a preliminary injunction on July 31, 2008 is hereby **GRANTED IN PART AND DENIED IN PART** as follows:

1.  The Defendant is hereby enjoined during the pendency of this action, until further Order from this Court, from using the name, logo, or mark "Garden & Gun" or "Garden and Gun" including but not limited to in the name "The Garden and Gun Club" in any manner whatsoever except when done in accord with the terms of this Order. In any advertisement or other promotion of its nightclub, the Defendant shall display the following disclaimer in letters of a size and boldness equal to the size and boldness of the letters comprising the largest rendition of the term or terms "Garden & Gun," "Garden and Gun" or "Garden and Gun Club" therein.  Such disclaimer shall read: "The Garden and Gun Club has no affiliation with and is not

sponsored by, owned by or in any way endorsed by Garden&Gun magazine.  This disclaimer is made pursuant to the Order of the United States District Court for the Western District of North Carolina in the case of Garden and Gun, LLC v. TwoDalGals, LLC, Civil Case No. 3:08cv349, entered August 21, 2008."  The terms advertisement or other promotion, as used above in this Order, shall specifically include but not be limited to the Defendant's web site or web sites, and any print media advertising.  Such disclaimer shall be positioned or situated within such advertisement or other promotion such that the disclaimer is easily readable and that its distance from the mark "Garden & Gun," "Garden and Gun" or "Garden and Gun Club" shall not be greater than the distance from the "G" in the word "Garden" to the "G" in the word "Gun," and on the same page thereof.  Such disclaimer shall so appear at least once on each page of the Defendant's web site and on each page of each such advertisement. In addition, the same said disclaimer shall appear and be posted in such a manner and in such proximity to all entrances to Defendant's nightclub as to be easily visible to all who enter the Defendant's nightclub, and shall be posted no more than four feet from each such entrance and shall be in print consisting of letters of no less than two

inches in height and in a boldness no less than the boldness of the print of the text of this Order relative to the size of the letters.

2.    This case shall be scheduled for trial in February 2009.

3.    The Plaintiff shall post security in the amount of $30,000.00 with the Clerk of Court for the United States District Court for the Western District of North Carolina within twenty-four hours of entry of this Order.  The injunction shall become effective only upon such posting.

4.    The parties shall file a Certificate of Initial Attorneys Conference on or before fifteen days from entry of this Order.

Signed: August 21, 2008

Martin Reidinger
United States District Judge